IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN CHEMISTRY COUNCIL

*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY

*Respondent*.

Case No. 23-1048

**PETITON FOR REVIEW**

Pursuant to section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), and Rule 15(a) of the Federal Rules of Appellate Procedure, the American Chemistry Council hereby petitions the Court for review of the final agency action of the United States Environmental Protection Agency entitled *National Emission Standards for Hazardous Air Pollutants: Site Remediation – Final rule; notification of final action on reconsideration* 87 Fed. Reg. 78545 (Dec. 22, 2022). A copy of the final rule is attached as Exhibit A.

                                        Respectfully submitted,

                                        /s/ David Friedland
                                        David Friedland (D.C. Cir. Bar No. 47402)
                                        BEVERIDGE & DIAMOND, PC
                                        1900 N Street, NW, Suite 100
                                        Washington, DC 20036
                                        202-285-4326
                                        dfriedland@bdlaw.com
                                        *Counsel for Petitioners*
                                        *American Chemistry Council*

*Of Counsel:*

Elliott Zenick
American Chemistry Council
700 Second Street NE
Washington, DC 20002

Dated: February 21, 2023

2

# EXHIBIT A

SIP submission that complies with the provisions of the Act and applicable federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve state choices, provided that they meet the criteria of the Clean Air Act. Accordingly, this action merely approves state law as meeting federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

• Is not a significant regulatory action subject to review by the Office of Management and Budget under Executive Orders 12866 (58 FR 51735, October 4, 1993) and 13563 (76 FR 3821, January 21, 2011);

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Public Law 104–4);

• Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Is not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act; and

• The state did not evaluate environmental justice considerations as part of its SIP submittal. There is no information in the record inconsistent with the stated goals of E.O. 12898 of achieving environmental justice for people of color, low-income populations, and indigenous peoples.

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian tribe has demonstrated that a tribe has jurisdiction. In those areas of Indian country, the rule does not have tribal implications and will not impose substantial direct costs on tribal governments or preempt tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. The EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 21, 2023. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Ozone, Particulate matter, Reporting and recordkeeping requirements, Volatile organic compounds.

Dated: December 14, 2022.

**Martha Guzman Aceves,**
*Regional Administrator, Region IX.*

Part 52, Chapter I, Title 40 of the Code of Federal Regulations is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for Part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart F—California

■ 2. Section 52.220 is amended by adding paragraphs (c)(379)(i)(C)(*9*), (c)(472)(i)(C)(*2*), and (c)(565)(i)(A)(*3*), reserved paragraph (c)(591), and paragraph (c)(592) to read as follows:

### § 52.220 Identification of plan—in part.

* * * * *

(c) * * *

(379) * * *

(i) * * *

(C) * * *

(*9*) Previously approved on November 8, 2011, in paragraph (c)(379)(i)(C)(*6*) of this section and now deleted with replacement in paragraph (c)(592)(i)(A)(*1*) of this section, Rule 4601, "Architectural Coatings," amended on December 17, 2009.

* * * * *

(472) * * *

(i) * * *

(C) * * *

(*2*) Previously approved on October 4, 2016, in paragraph (c)(472)(i)(C)(*1*) of this section and now deleted with replacement in paragraph (c)(565)(i)(A)(*3*) of this section, Rule 67.0.1, "Architectural Coatings," adopted on June 24, 2015.

* * * * *

(565) * * *

(i) * * *

(A) * * *

(*3*) Rule 67.0.1, "Architectural Coatings," rev. adopted on February 10, 2021.

* * * * *

(591) [Reserved]

(592) The following regulation was submitted on April 23, 2020, by the Governor's designee, as an attachment to a letter dated April 23, 2020.

(i) Incorporation by reference.

(A) San Joaquin Valley Unified Air Pollution Control District.

(*1*) Rule 4601, "Architectural Coatings," amended on April 16, 2020.

(*2*) [Reserved]

(B) [Reserved]

(ii) [Reserved]

* * * * *

[FR Doc. 2022–27723 Filed 12–21–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 63

[EPA–HQ–OAR–2002–0021; FRL–4866.1–02–OAR]

RIN 2060–AN36

### National Emission Standards for Hazardous Air Pollutants: Site Remediation

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; notification of final action on reconsideration.

**SUMMARY:** This action finalizes amendments to the national emission standards for hazardous air pollutants (NESHAP) for the site remediation source category. This action finalizes amendments to remove exemptions from the rule for site remediation activities performed under authority of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) as a remedial action or a non-time-critical removal action, and for site remediation activities performed under Resource Conservation and Recovery Act (RCRA) corrective actions conducted at treatment, storage, and disposal facilities.

**DATES:** This final rule is effective on December 22, 2022.

**FOR FURTHER INFORMATION CONTACT:** For questions about this final action, contact Matthew Witosky, Sector Policies and Programs Division (E143–05), Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711; telephone number: (919) 541–2865; and email address: *witosky.matthew@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Docket.* The EPA has established a docket for this rulemaking under Docket ID No. EPA–HQ–OAR–2002–0021. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy. With the exception of such material, publicly available docket materials are available electronically in *Regulations.gov* or in hard copy at the EPA Docket Center, Room 3334, WJC West Building, 1301 Constitution Avenue NW, Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
  A. Does this action apply to me?
  B. Where can I get a copy of this document and other related information?
  C. Judicial Review and Administrative Reconsideration
II. Background
  A. What is the purpose of this action?
  B. What is the statutory authority for this action?
III. Summary of Final Action and Significant Changes Since Proposal
  A. Removal of the CERCLA and RCRA Exemptions
  B. Retention of the Co-Location Requirement
  C. Compliance Dates
IV. Summary of Cost, Environmental, and Economic Impacts
  A. What are the affected sources?
  B. What are the air quality impacts?
  C. What are the cost impacts?
  D. What are the economic impacts?
  E. What are the benefits?
  F. What analysis of environmental justice did we conduct?
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act (CRA)

## I. General Information

### A. Does this action apply to me?

Categories and entities potentially regulated by this action are shown in Table 1 of this preamble.

TABLE 1—NESHAP AND INDUSTRIAL SOURCE CATEGORIES AFFECTED BY THIS FINAL ACTION

| Source category | NESHAP | NAICS code [1] |
|---|---|---|
| Industry | 40 CFR part 63, subpart GGGGG | 325211<br>325192.<br>325188.<br>32411.<br>49311.<br>49319.<br>48611.<br>42271.<br>42269. |
| Federal Government | | Federal agency facilities that conduct site remediation activities. |

[1] North American Industry Classification System.

### B. Where can I get a copy of this document and other related information?

In addition to being available in the docket, an electronic copy of this action is available on the internet. Following signature by the EPA Administrator, the EPA will post a copy of this final action at *https://www.epa.gov/stationary-sources-air-pollution/site-remediation-national-emission-standards-hazardous-air.* Following publication in the **Federal Register**, the EPA will post the **Federal Register** version of the action and key technical documents at this same website.

A redline version of the regulatory language that incorporates the finalized changes in this action is available in the docket for this action (Docket ID No. EPA–HQ–OAR–2002–0021).

### C. Judicial Review and Administrative Reconsideration

Under Clean Air Act (CAA) section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit (the court) by February 21, 2023. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal

proceedings brought by the EPA to enforce the requirements.

Section 307(d)(7)(B) of the CAA further provides that only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. This section also provides a mechanism for the EPA to reconsider the rule if the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within the period for public comment or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule. Any person seeking to make such a demonstration should submit a Petition for Reconsideration to the Office of the Administrator, U.S. EPA, Room 3000, WJC South Building, 1200 Pennsylvania Ave. NW, Washington, DC 20460, with a copy to both the person(s) listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. EPA, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

## II. Background

*A. What is the purpose of this action?*

On October 8, 2003, the EPA promulgated emission standards for control of certain hazardous air pollutants (HAP) from site remediations located at major sources of HAP—the 2003 Site Remediation NESHAP (68 FR 58172); 40 CFR part 63, subpart GGGGG. The 2003 Site Remediation NESHAP applied only to volatile organic HAP. 68 FR 58175. The 2003 Site Remediation NESHAP exempted site remediations performed under CERCLA authority as a remedial action or a non-time-critical removal action and site remediations under a RCRA corrective action conducted at a treatment, storage, and disposal facility (TSDF) that is either required by a permit issued by the EPA or a State program authorized by the EPA under RCRA section 3006; required by orders authorized under RCRA; or required by orders authorized under RCRA section 7003. 68 FR 58172 and 58176; 40 CFR 63.7881(b)(2) and (3). (This document refers to these exemptions as the ''CERCLA and RCRA exemptions''; however, it should be noted that the scope of these exemptions is narrower than the full scope of remediations that may be conducted under, or in relation to, CERCLA or RCRA authority.) The NESHAP also specified that site remediations are not subject to subpart GGGGG unless they are co-located at a facility with one or more other stationary sources that emit HAP and meet the affected source definition specified for a source category that is regulated by another subpart under part 63. 40 CFR 63.7881(a)(2). (This document refers to this as the ''co-location'' criterion.)

The CERCLA and RCRA exemptions were based on the EPA's conclusion that the requirements of these specific types of remediations under CERCLA and RCRA are ''functionally equivalent'' to the HAP emissions control requirements of the 2003 Site Remediation NESHAP. 68 FR 58176. EPA reasoned that these programs use remediation approaches that would generally address the protection of public health and the environment from air pollutants emitted from remediation activities on a site-specific basis. Further, in both programs, the public is given an opportunity to participate in the decision-making process, and both programs are subject to Federal oversight and enforcement authority. 68 FR 58184–85. However, the EPA did not make a determination in promulgating the RCRA and CERCLA exemptions that the kinds of emissions controls, including monitoring, recordkeeping and reporting requirements, that are implemented in the CERCLA and RCRA programs were at least as stringent as the requirements of the CAA, including that RCRA and CERCLA requirements met the maximum achievable control technology (MACT) standard established pursuant to CAA section 112(d). Nor did EPA identify a statutory basis for exempting these sources from CAA section 112 requirements.

Following promulgation of the 2003 Site Remediation NESHAP, on October 8, 2003, the EPA Administrator received a petition for reconsideration of certain aspects of the final rule from the Sierra Club, the Blue Ridge Environmental Defense League, and Concerned Citizens for Nuclear Safety. This petition stated that the EPA (1) lacked the statutory authority to promulgate the CERCLA and RCRA exemptions, and (2) had a duty to set standards for each listed HAP that petitioners alleged were emitted from the source category, specifically referring to heavy metal HAP, not just the volatile organic HAP listed in table 1 of the subpart. In addition, petitioners filed a petition for review of the 2003 Site Remediation NESHAP in the court, *Sierra Club et al.* v. *EPA,* No. 03–1435. The parties agreed to place this case in abeyance pending EPA's review of the petition for reconsideration.

On November 29, 2006, the EPA promulgated technical amendments to the 2003 Site Remediation NESHAP (71 FR 69011), but did not resolve, address, or respond to the issues in the petition for reconsideration. On October 14, 2014, the court ordered the parties in *Sierra Club et al.* v. *EPA* to show cause why the case should not be administratively terminated, and on November 13, 2014, the parties filed a joint response informing the court that they were actively exploring a new approach to the issues raised in the petition. On March 25, 2015, the EPA issued a letter [1] to the petitioners granting reconsideration on the issues raised in the petition and indicated that the agency would issue a **Federal Register** document initiating the reconsideration process (see Docket ID EPA–HQ–OAR–2002–0021–0150). The letter noted that the issue of regulation of heavy metal HAPs should be considered separately and as a part of the statutorily required risk and technology review (RTR). The petition for reconsideration and EPA's 2015 letter granting reconsideration are available for review in the rulemaking docket (Docket ID No. EPA–HQ–OAR–2002–0021–0024 and EPA–HQ–OAR–2002–0021–0150). On May 13, 2016, the EPA proposed to revise subpart GGGGG by removing the CERCLA and RCRA exemptions, as well as to remove the ''co-location'' condition in the NESHAP and requested comment on those proposed revisions (81 FR 29821).

Subsequently, on September 3, 2019 (84 FR 46138), the EPA proposed amendments to the Site Remediation NESHAP related to the RTR which was conducted as required under CAA sections 112(d)(6) and 112(f). In the 2019 proposal, the EPA used the opportunity to request additional comment regarding the implementation of the NESHAP under a scenario in which the CERCLA and RCRA exemptions were removed. Specifically, the EPA sought additional comments on whether subcategorization may be appropriate or whether there were other methods of distinguishing among appropriate requirements for CERCLA or RCRA-exempt sources, including how applicability, monitoring, recordkeeping, reporting, and compliance demonstration requirements could be structured so that formerly exempt sources would be able to comply with the Site Remediation NESHAP effectively and efficiently while also meeting the requirements of

---

[1] See Docket ID EPA–HQ–OAR–2002–0021–0150.

RCRA and/or CERCLA. 84 FR 46167–69. The EPA explained that it would take comments on these topics but act upon the exemptions at a later date.

Separately, in accordance with our March 25, 2015, letter, the RTR action reviewed the issue of whether heavy metals or other inorganic HAP may be emitted from this source category. We proposed that there is a lack of data indicating such HAP are emitted from this source category but requested comment seeking additional data. 84 FR 46161.

The EPA finalized the RTR on July 10, 2020 (85 FR 41680). We made clear that we were not acting on the CERCLA and RCRA exemptions, 85 FR 41683, and we finalized our proposed determination that there was a lack of data to support the assertion that inorganic and metal HAP are emitted from the site remediation source category and so we did not establish emissions standards for these HAP for the source category (85 FR 41690 and 41694–95).

The EPA proposed and finalized three key changes to the Site Remediation NESHAP in the RTR rulemaking (85 FR 41680). First, we revised leak detection thresholds for certain valves and pumps under the technology review required by CAA section 112(d)(6), see 85 FR 41690–91. Second, the rule addressed the startup, shutdown, and malfunction (SSM) case law under CAA section 112(d)(2) and (3) by adding a set of work practice requirements under CAA section 112(h) to monitor certain pressure release devices (PRDs) for actuation, 85 FR 41691–94. Third, the rule established a work practice standard also related to SSM with respect to planned routine maintenance of control systems on storage tanks, 85 FR 41695–96.

On September 8, 2020, Concerned Citizens for Nuclear Safety, Louisiana Environmental Action Network, and Sierra Club filed a petition for review of EPA's final RTR action in the court, *Concerned Citizens for Nuclear Safety* v. *EPA,* No. 20–1344 (D.C. Cir.). On that same date, Sierra Club filed a petition for reconsideration of the RTR, identifying as grounds for reconsideration the continued existence of the CERCLA and RCRA exemptions, and whether the Site Remediation NESHAP should regulate non-organic HAPs. [EPA–OAR–HQ–2002–0021–0050]

In this action, we are finalizing the May 13, 2016, proposal to remove the CERCLA and RCRA exemptions from the Site Remediation NESHAP and are addressing comments submitted in response to both the 2016 proposal and the 2019 RTR proposal on the exemptions issue. In the same 2016 action, we proposed to remove the criterion in 40 CFR 63.7881(a)(2) that an affected site remediation is only subject to the NESHAP if it is co-located with a facility that is a major source already subject to regulation under at least one other NESHAP in 40 CFR part 63. Based on our review of the public comments, as discussed in this action, we are not finalizing the proposal to remove the co-location criterion in this action.

We are not addressing in this action the second issue raised in the 2020 petition for reconsideration, *i.e.,* whether the EPA has a duty to set standards for non-organic HAP emissions from site remediation activities. The EPA will address that issue in a separate rulemaking.

*B. What is the statutory authority for this action?*

Section 112 of the CAA establishes a regulatory process to address emissions of HAP from stationary sources. CAA section 112(d) requires the Agency to promulgate technology-based NESHAP for each category or subcategory of major sources listed pursuant to CAA section 112(c). ''Major sources'' are defined in CAA section 112(a) as sources that emit or have the potential to emit 10 tons per year (tpy) or more of a single HAP or 25 tpy or more of any combination of HAP.

**III. Summary of Final Action and Significant Changes Since Proposal**

This action finalizes the EPA's determinations pursuant to the reconsideration of certain aspects of the 2003 Site Remediation NESHAP, and amends, as proposed, the Site Remediation NESHAP to remove the CERCLA and RCRA exemptions at 40 CFR 63.7881(b)(2) and (3). For affected sources that are existing sources, we are finalizing a compliance date of 18 months from the effective date of the final amendment removing the CERCLA and RCRA exemptions (see section III.C. for further discussion). We define existing sources, for purposes of this action, as those site remediations that commenced construction or reconstruction on or before May 13, 2016, the date of publication of the proposal to remove the exemptions. New sources, for purposes of this action, are those site remediations that commenced construction or reconstruction after May 13, 2016. Any new sources that would have formerly been exempted by 40 CFR 63.7881(b)(2) or (3) must comply with the NESHAP as of the date this document is published in the **Federal Register**. CAA section 112(d)(10), (i)(1).

The EPA is not finalizing the proposed amendment to remove the requirement that an affected site remediation be co-located with a facility that is regulated by other NESHAP. Our reasoning for this decision is explained in section III.B of this document. In the following subsections, we introduce and summarize the final amendments to the Site Remediation NESHAP. For each issue, this section provides a description of what we proposed and what we are finalizing, the EPA's rationale for the final decisions and amendments, and a summary of key comments and responses. For all comments not discussed in this preamble, comment summaries and the EPA's responses can be found in the comment summary and response document available in the docket.

*A. Removal of the CERCLA and RCRA Exemptions*

As discussed in the May 13, 2016, notice of proposed rulemaking on reconsideration of the NESHAP (81 FR 29821), the 2003 Site Remediation NESHAP exempted site remediations performed under the authority of CERCLA and those conducted under a RCRA corrective action or other required RCRA orders. The exemptions were based on the EPA's conclusion that the requirements of these programs consider the same HAP emissions as the 2003 Site Remediation NESHAP and, in addition, these programs provide opportunities for public involvement through the Superfund Record of Decision process and the RCRA permitting process for corrective action cleanups. The EPA concluded that these programs serve as the functional equivalent of the establishment of NESHAP under CAA section 112. Petitioners asserted that the public lacked an opportunity to comment on the functional equivalence conclusion. In the May 13, 2016, proposal, we proposed to amend the rule by removing 40 CFR 63.7881(b)(2) and (3) and solicited comment. In the proposal, we explained that on reconsideration we agreed with petitioners that the Agency lacked statutory authority under the Clean Air Act to exempt affected sources in a listed source category from otherwise applicable NESHAP requirements on the ''functional equivalence'' basis articulated in the 2003 final rule. 81 FR 29824. We further explained that the requirements of the Site Remediation NESHAP are appropriate and achievable at all subject site remediations, including those conducted under CERCLA or RCRA authority. *Id.* Also, as noted above, on September 3, 2019 (84 FR 46138), as

part of the statutorily required RTR, the EPA proposed amendments to the Site Remediation NESHAP. In the 2019 proposal, the EPA used the opportunity to request additional comment regarding the implementation of the NESHAP under a scenario in which the CERCLA and RCRA exemptions were removed.

Through the 2016 and 2019 proposals for the site remediation source category, the EPA solicited and received comments both in favor of and in opposition to the removal of the CERCLA and RCRA exemptions. The key comments and our responses are summarized below.

*Comment:* Several commenters stated that the EPA failed to provide a sufficient basis and purpose for the rule amendments as required by CAA section 307(d)(3). These commenters stated that nothing in CERCLA, RCRA, or the CAA has changed that would make the CERCLA and RCRA exemptions improper. The commenters also stated that since the agency does not expect any HAP reductions from the proposed changes (and in light of the 2019 risk assessment showing no adverse risks), there is no basis for these amendments. Several of these commenters stated that the EPA did not provide a basis for the proposed changes other than that the agency signed a consent agreement with the Sierra Club, noting that the proposal does not discuss why the agency's original conclusion that a RCRA/CERCLA-managed site remediation is the "functional equivalent" of the site remediation standard was incorrect or why that finding should be changed. One commenter also stated that CERCLA and RCRA provide ample safeguards for protecting public health and welfare with regard to HAP emissions, as evidenced by the EPA's estimate that there would be no further HAP reductions with the proposed changes. The commenter stated that due to this, the removal of the CERCLA and RCRA exemptions does not satisfy the CAA's intent to list sources which cause or significantly contribute to air pollution which might "reasonably be anticipated to endanger the public health or welfare."

*Response:* The EPA disagrees that the CERCLA and RCRA exemptions are proper. As explained in the preamble to the 2016 proposed rule, see 89 FR 29823–29824, the basis and purpose of the proposed rule amendments are to meet the obligations of the CAA to establish NESHAP for all sources in the listed source category. The site remediation source category was listed under CAA section 112(c)(1). Once a source category is listed, CAA section 112(c)(2) mandates that the EPA "shall establish emission standards under subsection [112](d)." CAA section 112(d) in turn mandates the establishment of emission standards "for each category or subcategory of major sources and area sources." While CAA section 112(d)(1) allows for distinguishing among classes, types, and sizes of sources in establishing emission standards, nothing in CAA section 112 authorizes the EPA to exempt certain sources entirely from emissions standards based on regulation under some other statute. Congress has made clear through the plain language of CAA section 112 that the development and implementation of NESHAPs promulgated pursuant to CAA section 112 is a mandatory mechanism for regulation of HAP emissions across all major sources of such emissions. *e.g., National Lime Association* v. *EPA,* 233 F.3d 625, 633–34 (D.C. Cir. 2000) (finding that section 112(d)(1) requires EPA to set emissions standards for all listed HAP emitted from each listed major source category or subcategory). This holds true for the site remediation source category notwithstanding that the RCRA and CERCLA programs may also address air pollutant emissions from disposal and remediation activities.

While we originally promulgated exemptions from the NESHAP for certain facilities, including facilities where site remediations were performed under authority of CERCLA or RCRA, we have re-evaluated the legal basis for these exemptions and determined that they should be removed. In response to the petition for reconsideration received pursuant to section 307(d)(7)(B) of the CAA in 2003 from the Sierra Club, the Blue Ridge Environmental Defense League, and Concerned Citizens for Nuclear Safety (which is available in the docket for this action), we have reconsidered the exemptions in the rule for these sources and our rationale for this approach.[2] We have determined, as explained above, that there is no statutory authority under section 112 of the CAA to exempt sources in a listed source category from NESHAP requirements simply because those sources may be subject to similar requirements through other statutes. In removing these exemptions, the EPA will be meeting its statutory obligations to establish and apply MACT standards for all affected source emissions of HAP at these major sources in the site remediation source category.

With respect to commenters' contention that nothing has changed since the 2003 promulgation of the NESHAP, we note that the basis for removing the exemption is to bring this NESHAP in line with the statutory requirement of CAA section 112 to regulate all affected sources of HAP in a listed source category. Case law since the 2003 promulgation of the NESHAP has only strengthened and confirmed that this is a correct understanding of the plain language of the statute. *E.g., Sierra Club* v. *EPA,* 479 F.3d 875, 878 (D.C. Cir. 2007) (confirming the holding in *National Lime Association* v. *EPA,* 233 F.3d 625, 633–34 (D.C. Cir. 2000)).

With respect to commenters' contention that EPA did not, in its 2016 proposal, explain why the agency's original conclusion that a RCRA or CERCLA-managed site remediation is the "functional equivalent" of the site remediation standard was incorrect, EPA disagrees that such an explanation is necessary, because the CAA does not authorize exemptions on this basis in the first place. Nonetheless, as the EPA explained in the May 2016 proposal, the site remediation activities conducted under the authority of CERCLA and RCRA are similar to site remediation activities that were not exempt from the Site Remediation NESHAP, and the requirements of the Site Remediation NESHAP are appropriate for and achievable by all site remediation activities.

*Comment:* Several commenters stated that the Site Remediation NESHAP amendments should not apply retroactively to existing RCRA and CERCLA site remediations. Two commenters added that if it were to apply to any of these sites, it should be only to remediation projects that are not yet fully developed. In the alternative, these commenters suggested that compliance with CERCLA or RCRA corrective action requirements should be deemed as compliance with the Site Remediation NESHAP. Other commenters suggested that where remediation plans under CERCLA or RCRA have already been approved and the plans include air emission control requirements, the EPA should view these as acceptable work practice and control standards. These commenters stated that this would also alleviate any potential conflicts between the Site Remediation NESHAP and the approved remediation plan under CERCLA or RCRA. One commenter also added that the evaluations of the hazards associated with the remediation activity required under CERCLA are more

---

[2] Commenter is incorrect that the EPA entered into a consent decree with environmental organizations. While the EPA and those parties had considered entering into a settlement agreement in *Sierra Club* v. *EPA,* No. 03–1435 (D.C. Cir.), that agreement was never finalized.

inclusive and protective than the Site Remediation NESHAP requirements. Several commenters stated that a grandfathering provision should be put in place to ensure the sites currently conducting an approved CERCLA or RCRA remediation at the time of the adoption of the final rule can continue to clean up with no delays. One commenter noted that there is precedent for this in NESHAPs, such as the Pharmaceutical NESHAP, which grandfathered existing process vents that were controlled by 93 percent or greater prior to the NESHAP proposal date.

A commenter added that removal of the exemption would eliminate the EPA's current site-specific discretion to determine whether application of the Site Remediation NESHAP is relevant and appropriate for a site. The commenter noted that the reason many sites are addressed under CERCLA is because they are large and complex, and applying the Site Remediation NESHAP may not be consistent with the methods that would otherwise be used to perform the remediation. The commenter also added that even if an alternative work practice were approved, this could either delay the remediation or force additional administrative activities to occur under the CAA. The commenter also remarked that under CERCLA, only the substantive requirements of other laws are considered potentially relevant and appropriate, but not the administrative requirements, such as reporting and recordkeeping. The commenter asked that the EPA consider creating subcategories that would exempt certain large-scale remediation activities, such as cleanups of large volumes of soil, sludge, or sediment, as the Site Remediation NESHAP may interfere with the use of the remedial technologies that would otherwise be selected under the National Contingency Plan.

*Response:* The EPA disagrees that existing site remediations should not be subject to the Site Remediation NESHAP. Section 112 of the CAA requires that the EPA issue regulations addressing both new and existing sources. *See, e.g.,* CAA sections 112(a), (d), and (i). Removing the exemptions is not retroactive rulemaking. Retroactivity refers to requirements ''extending in scope or effect to matters that have occurred in the past.'' Black's Law Dictionary 1318 (7th Ed. 1999). The EPA is not applying the removal of the exemptions retroactively but rather prospectively. The requirements of the NESHAP will apply going forward at both new and existing site remediation sources. As authorized under CAA section 112(i)(3), the compliance date for existing sources is 18 months after the effective date of this final rule. In line with how other source categories are regulated, this will provide time for existing site remediations (existing as of May 13, 2016) that become newly subject to the NESHAP through the removal of the CERCLA and RCRA exemptions to comply with the requirements of the Site Remediation NESHAP in accordance with the governing cleanup program's statutory and regulatory requirements. During this time period, the owners or operators of the site remediation affected source will be able to evaluate the need for additional emissions control in accordance with the governing cleanup program and put those controls in place by the compliance date. The commenters have supplied no information with reasonable specificity that this time period for compliance, or the NESHAP's requirements themselves, will unduly delay cleanup activities.

The commenters' requests to consider compliance with CERCLA or RCRA sufficient for compliance with CAA requirements is effectively a request to simply continue the exemptions. As explained above, Congress directed EPA, under CAA section 112, to establish emission standards for listed source categories under the procedures and criteria of that section of the Act and did not provide for EPA to defer that standard-setting process to other statutory programs.

We are not reopening our 2003 determinations regarding MACT for the Site Remediation NESHAP. Under the reasoning and analysis of the original 2003 promulgation of 40 CFR part 63, subpart GGGGG, the EPA's MACT findings were equally valid for the CERCLA and RCRA sources that the EPA exempted.[3] However, we reviewed the comments to determine whether a basis existed to revisit these determinations with respect to the CERCLA and RCRA sources, and we find that commenters have not provided information to the agency that would warrant reopening these determinations.

In particular, commenters have not supplied sufficient information to establish why ''grandfathering'' a particular emission standard is appropriate, even if ''grandfathering'' may have been used in the one example cited by commenter. The requirements of the NESHAP have been applicable to non-exempt new and existing site remediation sources since the original NESHAP was promulgated, and the EPA is not aware of any existing sources facing difficulty with compliance with the requirements of the NESHAP, nor have commenters supplied such information.

Nor have the commenters supplied information or examples demonstrating that compliance with the requirements of the NESHAP is incompatible or will interfere with the implementation of ongoing CERCLA or RCRA remediation activities at the formerly exempt sites. In general, the Site Remediation NESHAP does not prescribe remediation strategies, technology, or equipment, but rather establishes emissions limits and in some cases work practice standards that apply depending on the kinds of strategies selected for the remediation (*e.g.,* if process vents are used, then requirements applicable to process vents apply, if tanks are used, then requirements applicable to tanks apply, etc.). As the EPA indicated at proposal, and as commenters have generally affirmed, the EPA believes that, for the most part, the standards established in the NESHAP are already being met at CERCLA and RCRA overseen cleanups, and thus the emissions control requirements of the NESHAP should not be unreasonably costly or onerous to meet.

Further, the process and sources of information used in adopting the original standards confirm that there is no need to reopen our category-wide MACT determinations. To select a MACT emissions limitation (or work practice standard) for each affected source, in the original promulgation of the NESHAP, we looked at the types of air emission controls required under national air emission standards for sources similar to those sources that potentially may be associated with site remediations. These air emission standards are MACT for other source categories, particularly the Off-site Waste and Recovery Operations (OSWRO) NESHAP under 40 CFR part

---

[3] Similarly, the amendments to the NESHAP in the RTR action in 2020 are applicable and achievable for the entire source category and were not premised on the continued existence of the CERCLA and RCRA exemptions. Two of the three key changes were related to the need to address SSM case law under CAA section 112(d)(2) and (3) and were applied as achievable work practice standards for the entire source category, 85 FR 41691–96. The EPA acknowledged that its analysis of the impact of the third change, the leak detection and repair enhancements, was not assessed for exempt sources, *id.* 41690. However, the EPA did not find any basis in the RTR rulemaking to treat the exempt sources differently should the exemption be lifted, but merely noted that the impacts of this change would be considered if the exemptions were removed. The EPA has considered these impacts for the CERCLA and RCRA exempt sources, including both environmental benefits and costs, with respect to all of the key changes to the NESHAP made in the RTR. Section IV of this preamble.

63, subpart DD, and the air emission standards for RCRA hazardous waste treatment, storage, and disposal facilities under subparts AA, BB, and CC in 40 CFR parts 264 and 265 (RCRA Air Rules). The control levels established by the emission limitations and work practices we promulgated are widely implemented at existing sources subject to these similar rules, thus demonstrating that the control levels are technically achievable. *See* 68 FR 58174.

Thus, these control requirements and action levels already existed in either the RCRA Air Rules or the OSWRO NESHAP, or both. Given that these existing rules specify control requirements for sources similar to those comprising the affected source group for the Site Remediation NESHAP, and that sources already regulated by these existing standards also will likely manage and/or treat remediation material regulated by the Site Remediation NESHAP, we continue to believe that the requirements of subpart GGGGG represent achievable industry practice for remediation activities including at the formerly exempt RCRA and CERCLA sites.

Further, as commenters acknowledge, CERCLA cleanups should be designed to meet the substantive environmental requirements of other statutes in accordance with compliance with Applicable or Relevant and Appropriate Requirements (ARARs) under CERCLA section 121(d). The programmatic requirements of CERCLA require the consideration of virtually any Federal standard as an ARAR, including the Site Remediation NESHAP. In other words, substantive requirements of the Site Remediation NESHAP are expected to be considered as potential ARARs.[4] Furthermore, the substantive provisions may also have been considered relevant and appropriate requirements under CERCLA on a site-specific basis since the promulgation of the regulations in 2003.

Finally, the EPA notes that decisions on compliance with ARARs are made within the CERCLA regulatory framework rather than the Clean Air Act, and as a result, the EPA will not address these issues in this action. For example, CERCLA authorizes waivers from applicable environmental regulations in certain situations. Two examples of potential waivers authorized in the statute are when compliance with a substantive Federal requirement that may be an ARAR may result in greater risk to human health and the environment or where other alternatives will achieve equivalent performance. CERCLA section 121(d)(4). In any event, CERCLA remediations must assure protection of human health and the environment. While the EPA anticipates that waiver circumstances should be rare in meeting the requirements of the Site Remediation NESHAP, nonetheless, such flexibility is available on an as-needed basis through the provisions of CERCLA rather than the CAA.

For the reasons discussed above and in the preamble for the proposed rule and our response to comments document available in the docket, we are removing the CERCLA and RCRA exemptions from the Site Remediation NESHAP.

*B. Retention of the Co-Location Requirement*

In the May 13, 2016, proposal on reconsideration, the EPA proposed to remove the criterion in 40 CFR 63.7881(a)(2) that an affected site remediation is only subject to the NESHAP if it is co-located with a facility that is a major source already subject to regulation under at least one other NESHAP in 40 CFR part 63. This rule change was proposed to further effectuate the removal of the exemptions so that any formerly exempt CERCLA or RCRA site remediations that are themselves major sources of HAP, without regard for co-location with a major source, should be subject to the rule. 81 FR 29824. This proposed amendment would have the effect of making any site remediations with emissions in excess of major source thresholds subject to the Site Remediation NESHAP for the first time, and would affect all site remediations, not only those falling under the CERCLA or RCRA exemptions.

Based on our review of the public comments, as discussed below, the EPA is not finalizing this proposed rule amendment in this action.

The EPA received several comments in opposition to the removal of the co-location requirement. Key comments and our response include the following:

*Comment:* Two commenters expressed concern that with the removal of the criteria that a remediation be co-located with a major source facility for HAP, an oil or chemical spill with emissions over the major source thresholds set out in CAA section 112(a)(1) would be subject to the rule, even if the spill occurred in a remote, inaccessible, or potentially expansive location, such as remote Alaska. The commenters urged the EPA to keep the co-location condition or provide an exemption for remediation as a result of a spill response. One commenter added that without the co-location condition, applicability will likely extend to small sources that were not considered in the original rulemaking.

*Response:* We have concluded that it is not appropriate to finalize the proposed rule amendment to remove the co-location criterion, and we are retaining that provision of the NESHAP. Based on the available information regarding the amount of HAP emitted from site remediations, remediation facilities that are not co-located with major sources are not major sources of HAP—*i.e.,* the Agency has no data to suggest that site remediation affected sources that are not already co-located with a major source themselves emit greater than 10 tons per year of any single HAP or 25 tons per year of all HAPs.[5] The effect of removing the co-location criterion would be to require applicability determinations in many situations where it would be extremely difficult to substantiate whether the applicability thresholds are met or not, and yet it would be unlikely that such thresholds are met. As commenters observe, such circumstances could arise in emergency scenarios where there is an overriding imperative to address immediate threats to human health or the environment. At such source locations (*e.g.,* in the field or along transportation corridors), neither the ''source'' itself (*e.g.,* the site of a spill that is being remediated), or its ''owner or operator,'' may have any experience with CAA compliance, including the necessary permitting requirements, the data for making CAA applicability determinations, or requirements for monitoring, recordkeeping, and reporting. They may not even possess requisite ownership interests in such sites to be able to effectively implement such requirements. The onset of Site Remediation NESHAP compliance obligations in these circumstances—even if limited to making an applicability determination based on the level of emissions that could occur from site remediation activities—could inhibit or delay responders from taking necessary, immediate steps to protect human health and the environment. Therefore, because there are no data

---

[4] Compliance With Other Laws Manual Parts I and II (OSWER 540–G–89–006, Aug. 8, 1989 and Aug. 1989), both available in the docket at EPA–HQ–OAR–2002–0021.

[5] EPA's analysis for the RTR reviewed NEI data for active remediations. Active remediation emissions averaged less than 1 percent of emissions of the associated major sources subject to the rule. [National Emission Standards for Hazardous Air Pollutants: Site Remediation Residual Risk and Technology Review, Docket ID EPA–HQ–OAR–2018–0833–0001].

suggesting that there are site remediations that are themselves major sources of HAP, and to avoid the potential that rendering applicability determinations could inhibit site remediations in a variety of unusual or emergency circumstances, the EPA is retaining the applicability condition that site remediations be co-located with a facility that is a major source regulated by at least one other NESHAP.[6]

As the EPA is not finalizing the proposed amendment to remove the co-location condition, remote sites not co-located at a stationary source of HAP regulated by another NESHAP will not be regulated through this action. However, we note that if and when a site remediation is performed as a result of a spill, it will be necessary to bring personnel and remediation equipment to the area, and those responding to such circumstances can be expected to implement situation-appropriate measures to protect air quality under relevant emergency response actions, as provided for under CERCLA, Clean Water Act section 311, and other relevant remediation and emergency response statutes at the state and Federal levels.

*C. Compliance Dates*

The EPA proposed several compliance dates in the May 13, 2016, proposed notice of reconsideration. We proposed to make the recordkeeping and reporting requirements specified in 40 CFR 63.7950 through 63.7953 and 63.7955 applicable to new and existing affected sources conducting site remediations under CERCLA or RCRA on the effective date of the final amendments removing the CERCLA and RCRA exemptions, which is the date of publication of this final rule in the **Federal Register**.

For existing affected sources (*e.g.,* existing as of May 13, 2016), we proposed a compliance date for the rule's other requirements for site remediations conducted under the authorities of CERCLA or RCRA of 18 months from the effective date of the final amendments removing the CERCLA and RCRA exemptions.

For new affected sources, we proposed a compliance date for the rule's requirements for site remediations conducted under the authorities of CERCLA or RCRA of the effective date of the final amendments removing the CERCLA and RCRA exemptions or upon initial startup, whichever is later.

Based on our review of the public comments, as discussed below, the EPA is finalizing this action with one change to the proposed compliance dates for existing affected sources. For existing affected sources, the compliance date for *all* the site remediation NESHAP requirements, including the recordkeeping and reporting requirements specified in 40 CFR 63.7950 through 63.7953 and 63.7955, is 18 months from the effective date of the final amendments removing the CERCLA and RCRA exemptions. This date is June 24, 2024. For new affected sources, the compliance date for all the site remediation NESHAP requirements is the effective date of the final amendments removing the CERCLA and RCRA exemptions or upon initial startup, whichever is later. CAA section 112(d)(10), (i)(1).

The EPA received several comments regarding these compliance timeframes. These comments are summarized below along with our responses.

*Comment:* Several commenters stated that a compliance date 18 months after the final rule is promulgated may be appropriate for facilities that do not require additional emission controls but claimed that additional time will be needed for facilities that require additional emission controls. Several other commenters stated that 18 months is not enough time to comply with the rule, and potentially not enough time to even determine whether sources are exempt from the rule. These commenters suggest 3 years be given for compliance with the rule amendments. One commenter also suggested that the EPA incorporate into the compliance date the time needed to modify existing RCRA permits or CERCLA records of decision (RODs) to reflect new control devices, time for getting an air construction permit, and time for approval of alternative test methods. This commenter suggested a compliance date of 5 years after the promulgation of the standards. One commenter noted concerns about the compliance date for new sources, which may start up soon after promulgation of the amendments. The commenter recommends that new sources be provided 3 years from the amendment affected date or until initial startup, whichever is later, to comply.

*Response:* We have concluded that 18 months after the effective date of this action is sufficient time for existing sources to come into compliance. We consider 18 months a reasonable estimate for the work to be done. We also note that commenters have not supplied reasonably specific information that 18 months is not practicable, and the EPA is obligated to require compliance with these requirements as expeditiously as practicable. CAA section 112(i)(3). Further, the EPA does not have discretion under the statute to provide 5 years for existing sources to come into compliance as suggested by one commenter. *See id* (requiring compliance no later than 3 years after the effective date).

As the EPA indicated at proposal, and as commenters have generally affirmed, for the most part, the emissions standards established in the NESHAP are already being met at cleanups overseen under CERCLA and RCRA, and thus additional emissions controls are unnecessary in most cases. To comply with the NESHAP, we anticipate that some facilities may need to install pressure relief device monitors, which entails identifying affected pressure release devices and installing monitors that are capable of alerting a facility operator of a pressure release device actuation. When these requirements were added to the Site Remediation NESHAP in 2020 (85 FR 41680), the compliance date selected for existing sources was 18 months, to allow site remediation facility owners and operators to research equipment and vendors, and to purchase, install, test, and properly operate any necessary equipment. The EPA considers that providing more than 18 months now for existing facilities operating under the authority of RCRA or CERCLA to comply would be excessive compared to the compliance period provided for other existing facilities and relative to the actual work involved. We also anticipate that some existing facilities may need to revise their leak detection and repair (LDAR) programs to use the leak definitions included in 40 CFR part 63, subpart UU, for valves and pumps. A compliance time of 18 months is adequate for existing facility owners or operators to modify their existing LDAR programs to comply with these standards for pumps and valves. When the requirement to comply with 40 CFR part 63, subpart UU, was added to the Site Remediation NESHAP in 2020 (85

---

[6] We note that the fact that we do not believe there are site remediations that are themselves major sources in no way undermines the basis for the listing of the site remediation category itself (which we are not reopening), or the requirements of the NESHAP. Site remediation affected sources are associated with other major sources of HAP, and site remediation sources would otherwise go unregulated under CAA section 112 at those major sources in the absence of this NESHAP. Thus, the EPA views this NESHAP as necessary to ensure that all sources of HAP at major sources are addressed under CAA section 112. *National Lime Association* v. *EPA,* 233 F.3d 625, 633–34 (D.C. Cir. 2000) (finding that section 112(d)(1) requires EPA to set emissions standards for all listed HAP emitted from each listed major source category or subcategory); *Sierra Club* v. *EPA,* 479 F.3d 875, 878 (D.C. Cir. 2007) (confirming holding that section 112(d)(1) requires EPA to set emissions standards for all listed HAP emitted from each listed major source category or subcategory).

FR 41680) for the leak definitions for valves and pumps rather than the leak definitions of 40 CFR part 63, subpart TT, we provided a one-year compliance date for these requirements for existing facilities. However, to simplify compliance, in this action we have provided one date (*i.e.,* 18 months after promulgation) by which existing facilities must meet all requirements.

In order to avoid any confusion and unnecessary burden regarding the onset of compliance requirements under the NESHAP for formerly exempt existing sources (*e.g.,* existing by May 13, 2016), we are not finalizing our proposal that existing sources comply by the effective date of the final rule with the recordkeeping and reporting requirements of 40 CFR 63.7950 through 63.7953 and 63.7955. While we generally believe such requirements could be complied with relatively quickly, the content of many of these requirements relates to information regarding compliance with emissions limitations, work practice standards, or other requirements that would not begin until 18 months after the effective date of this action. *E.g.,* 40 CFR 63.7951(a)(1) (first compliance report not due until the onset of compliance obligations according to the schedule established in 40 CFR 63.7883). The Agency has determined that it would make sense in this case to simply align the onset of all requirements of subpart GGGGG for existing sources under a single compliance schedule. Thus, for existing sources, the compliance date for all requirements of the NESHAP will be 18 months from the effective date of this rule.

Affected sources that commenced construction or reconstruction after May 13, 2016 (the date we proposed to remove the exemptions), are ''new sources'' for purposes of section 112 and must comply immediately upon the effective date of this final rule or on initial startup, whichever is later. This is consistent with the CAA, and the EPA does not have discretion to alter this requirement. CAA section 112(a)(4), 112(d)(10), and 112(i)(1).

To the extent any source-specific circumstances may exist warranting potential relief from compliance timing as authorized by the statute, source owners or operators are encouraged to review the mechanisms for obtaining such relief that are available under subpart A of part 63. 40 CFR 63.6. For example, 40 CFR 63.6(i) allows the Administrator to grant extensions of compliance with emission standards under certain specified circumstances.

For purposes of complying with the Initial Notification requirements of 40 CFR 63.9(b)(2), the EPA is not finalizing any changes to the language of 40 CFR 63.7950 in this action. However, with respect to both new and existing affected sources formerly covered by the CERCLA and RCRA exemptions being removed in this action, the Agency interprets the phrase ''120 calendar days after the source becomes subject to this subpart'' as used in paragraphs (b) and (c) of § 63.7950 as referring to the date 120 calendar days after the publication of this document in the **Federal Register**.

Finally, we note that when and how records of decision at CERCLA Superfund sites may be reopened, amended, or modified is a matter to be addressed within the Superfund program itself rather than in this CAA action.

We are, therefore, finalizing a compliance date of 18 months from the effective date of these final amendments for existing sources and on the effective date or upon initial startup, whichever is later, for new sources that become subject to the Site Remediation NESHAP as a result of the removal of the CERCLA and RCRA exemptions.

## IV. Summary of Cost, Environmental, and Economic Impacts

### A. What are the affected sources?

We estimate 74 facilities will become subject to the Site Remediation NESHAP as a result of the removal of the CERCLA and RCRA exemptions. Based on available information from the RCRA and CERCLA programs, 31 of these 74 facilities are expected to be subject to only a limited set of the rule requirements under 40 CFR 63.7881(c)(1). Due to the low annual quantity of HAP contained in the remediation material excavated, extracted, pumped, or otherwise removed during the site remediations conducted at these facilities, they would likely only be required under the Site Remediation NESHAP to prepare and maintain written documentation to support the determination that the total annual quantity of the HAP contained in the remediation material excavated, extracted, pumped, or otherwise removed at the facility is less than 1 megagram per year. For the remaining 43 facilities, we anticipate each facility will have an annual quantity of HAP in the removed remediation material of 1 megagram or more. For these facilities, we expect that the facilities already generally meet the emission control and work practice requirements of the Site Remediation NESHAP. As discussed in further detail below, we anticipate certain formerly exempt facilities will incur some limited costs to comply with current SSM provisions in the NESHAP following the RTR rulemaking, 85 FR 41691–96, and the updating of leak detection and repair requirements under CAA section 112(d)(6), 85 FR 41690–91. These impacts are estimated below.

The 2020 RTR rulemaking for the site remediation source category made three substantive changes to the standards. We modified the threshold for detection of leaks for valves and pumps within the existing LDAR program. We also added a requirement to monitor certain pressure release devices (PRDs).[7] While current RCRA standards in subpart BB (40 CFR 264.1050) include LDAR, the leak threshold for valves and pumps in light liquid service are 10,000 ppm. In the 2020 RTR for site remediation, the NESHAP's thresholds were revised to 500 ppm for valves, 1,000 ppm for pumps upon inspection, and 2,000 ppm to make a repair. These changes pursuant to the technology review could require additional actions from affected sources to comply with the Site Remediation NESHAP. However, the decision to remove the CERCLA and RCRA exemptions is not dependent on or affected by the cost of compliance with these changes. We stated in the 2016 proposal that we did not anticipate significant costs of compliance for sources affected by removal of the exemptions. We continue to find this to be the case; however, given that the NESHAP was modified in the interim, we have updated our impact analysis to reflect these changes in the NESHAP, which may result in slightly greater environmental benefits due to removing the exemptions, and some slightly higher compliance costs, as summarized in section IV.C.[8]

Of the 43 facilities that we anticipate will have an annual quantity of HAP in the removed remediation material of 1 megagram or more, we anticipate that 30 will have no applicable emission control requirements or work practice standards because the waste is shipped offsite for treatment and no controls or work practice requirements would be applicable prior to treatment. For these 30 facilities, we anticipate the only new requirements for the Site Remediation NESHAP will be the initial and ongoing recordkeeping and reporting obligations

---

[7] The EPA added a work practice standard for certain storage vessels. That work practice was determined to be without cost. 85 FR 41696. Note that the SSM changes were made under authority of 112(d)(2) and (3) rather than (d)(6).

[8] While this section discloses to the public the overall anticipated impacts of this action as per standard Agency practice, the EPA is not reopening any of its MACT or RTR determinations for this source category. *See* section III.A.

required by 40 CFR 63.7936 and 63.7950 through 63.7952. These sections describe the recordkeeping and reporting activities required for transferring the remediation material off-site to another facility; the initial notification and on-going notification requirements; the ongoing semi-annual compliance reporting requirements; and recordkeeping requirements for continuous monitoring, planned routine maintenance, and for units that are exempt from control requirements under §§ 63.7885(c) and/or 63.7886(d).

The remaining 13 facilities are anticipated to have on-site remediation activities for which the emission control requirements of the NESHAP will apply. While we anticipate that most of these emission control activities are already being conducted under existing requirements through RCRA or CERCLA, the PRD and revised LDAR requirements (*e.g.,* new leak detection and repair thresholds for valves and pumps) will also apply, as well as the recordkeeping and reporting activities described above.

Finally, as explained in the following section, while the EPA generally expects that existing, formerly exempt site remediations are already meeting the substantive emissions control requirements of the NESHAP (with the possible exception of the revisions to the NESHAP promulgated in the 2020 RTR rulemaking), there is at least some anecdotal evidence from comments that this may not be the case in all circumstances. As explained in greater detail in the response to comments document, to the extent this situation exists, it could mean the compliance costs of this action are proportionately greater than we estimate; however, such circumstances do not obviate any prior determinations of cost-effectiveness with respect to this NESHAP. Indeed, such circumstances would only strengthen the basis for removing the exemptions to ensure that the emissions reduction benefits of this NESHAP are achieved.

While new site remediations are likely to be conducted under the authority of CERCLA or RCRA in the future, we are currently not aware of any such new site remediation affected sources that are expected to be constructed.

The potential scope of this action's impacts on affected entities is discussed in greater detail in the memorandum, ''National Impacts Associated with the Final Amendments to Remove the Exemption for Facilities Performing Site Remediations under CERCLA or RCRA in the NESHAP for Site Remediation,'' which is available in the rulemaking docket (Docket ID No. EPA–HQ–OAR–2002–0021).

*B. What are the air quality impacts?*

We estimate that the application of the change in the LDAR leak thresholds to the formerly exempt sources will result in a HAP emissions reduction of 2 tons per year. As explained in the memo ''Leak Detection and Repair Program Impacts for Site Remediation RCRA and CERCLA Facilities'' the lower leak threshold has the potential to reduce emissions by requiring repair of smaller leaks.

A second change made in the 2020 rule included a requirement to perform additional monitoring of PRD actuations that will also apply to formerly exempt sources. The PRD monitoring leads to emission reductions by immediately alerting operators to the actuation of a PRD, which is typically caused by a malfunction. Due to their nature, the frequency or duration of malfunctions cannot be predicted, so estimation of future emissions reductions is not possible. As such, no additional emissions reductions due to the addition of PRD monitoring are included in our assessment of air quality impacts.

For the remainder of the Site Remediation NESHAP requirements, we estimate the potential for a small amount of HAP emission reductions from the removal of the CERCLA and RCRA exemptions. We expect that most facilities newly becoming subject to the rule will either be subject to a limited set of the emissions control requirements of the rule due to the low amount of HAP contained in the remediation material handled, will already meet the emissions control requirements of the rule, or will not have any applicable emissions control requirements for the specific remediation activities and material handled. We received comments that some sources subject to RCRA or CERCLA requirements would be required to add or supplement controls if the applicability of the NESHAP was changed. The EPA acknowledges that such a situation could arise and only strengthens the basis for removing the exemptions to ensure that the emissions reduction benefits of this NESHAP are achieved. The commenters did not provide information to allow us to make a reliable estimate of how often this may occur, or the cost or amount of emission reductions that could result from applicable requirements and controls. It is also possible that with further examination of the NESHAP and the existing emissions controls at their facility(s), a commenter could determine that no further emission control is necessary. Another possibility is that certain requirements that should have been in place will now be imposed, and the corresponding emissions reductions will now be realized, further strengthening the basis for removing these exemptions. Thus, the EPA acknowledges that there may be HAP emissions reductions as a result of the remainder of the Site Remediation NESHAP requirements, but we have not quantified the potential reductions beyond the 2 tons per year from LDAR reductions, due to a lack of information to substantiate or quantify the potential reductions. Therefore, while unquantified, we consider there is a potential for an unquantified amount of HAP emission reductions to result from this action.

*C. What are the cost impacts?*

We anticipate that 13 of the 74 affected facilities will implement additional emissions control measures to meet the LDAR and PRD requirements of the Site Remediation NESHAP at a total estimated capital cost of $79,000 and a total annual cost of $21,000 for all 13 facilities. We have estimated the nationwide annual compliance costs, including the LDAR and PRD requirements for these facilities as well as the reporting and recordkeeping requirements for all 74 affected facilities to be approximately $2.7 million.

*D. What are the economic impacts?*

The EPA conducted economic impact analyses for this final rule, as detailed in the memorandum, ''Economic Impact Analysis for Site Remediation NESHAP Amendments: Final Report,'' which is available in the docket for this action (Docket ID No. EPA–HQ–OAR–2002–0021). The economic impacts of the rule are calculated as the percentage of total annualized costs incurred by each affected ultimate parent owner relative to their revenues. This ratio provides a measure of the direct economic impact to ultimate parent owners of facilities while presuming no impact on consumers. We estimate that none of the ultimate parent owners affected by this proposal will incur total annualized costs of 0.1 percent or greater of their revenues. Thus, these economic impacts are low for affected companies and the industries impacted by this rule, and there will not be substantial impacts on the market. The costs of the rule are not expected to result in a significant market impact, regardless of whether they are passed on to the purchaser or absorbed by the firms.

*E. What are the benefits?*

The final standards are projected to achieve 2 tons of reductions in HAP through the applicability of lower leak detection and repair thresholds. In addition, we anticipate some unquantified amount of HAP emissions reduction at some formerly exempt site remediations as a result of additional monitoring of PRDs. In addition, any future remediation activities initiated at the formerly exempt existing site remediations or site remediations constructed in the future will include the required levels of HAP emissions control. To the extent facilities newly subject to the NESHAP must revise their CAA monitoring, recordkeeping and reporting, we anticipate improved data and information with respect to air emissions at these facilities. We have not quantified the monetary benefits associated with the amendments; however, the avoided emissions will result in improvements in air quality and reduced negative health effects associated with exposure to air pollution from these emissions.

*F. What analysis of environmental justice did we conduct?*

Executive Order 12898 directs the EPA to identify the populations of concern who are most likely to experience unequal burdens from environmental harms; specifically, minority populations (people of color and/or Indigenous peoples) and low-income populations (59 FR 7629, February 16, 1994). Additionally, Executive Order 13985 is intended to advance racial equity and support underserved communities through Federal Government actions (86 FR 7009, January 25, 2021). The EPA defines environmental justice (EJ) as ''the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies.'' The EPA further defines fair treatment to mean that ''no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies.'' In recognizing that people of color and low-income populations often bear an unequal burden of environmental harms and risks, the EPA continues to consider ways of protecting them from adverse public health and environmental effects of air pollution. Consistent with EPA's commitment to integrating EJ in the Agency's actions, and following the directives set forth in multiple Executive Orders, the Agency has carefully considered the impacts of this action on communities with EJ concerns.

To examine the potential for any EJ concerns that might be associated with site remediation facilities that are affected by removing these exemptions, we performed a demographic analysis, which is an assessment of individual demographic groups of the populations living within 5 kilometers (km) and 50 km of the facilities. The EPA then compared the data from this analysis to the national average for each of the demographic groups.

The results show that for populations within 5 km of the 74 existing facilities, the following demographic groups were above the national average: African American (15 percent versus 12 percent nationally), Hispanic/Latino (21 percent versus 19 percent nationally), Other/Multiracial (16 percent versus 8 percent nationally), people living below the poverty level (16 percent versus 13 percent nationally), over 25 without a high school diploma (14 percent versus 12 percent nationally) and linguistic isolation (7 percent versus 5 percent nationally).

The results show that for populations within 50 km of the 74 existing facilities, the following demographic groups were above the national average: African American (15 percent versus 12 percent nationally), Hispanic/Latino (21 percent versus 19 percent nationally), Other/Multiracial (12 percent versus 8 percent nationally), over 25 without a high school diploma (13 percent versus 12 percent nationally) and linguistic isolation (7 percent versus 5 percent nationally). The average percentage of the population living within 50km of the 74 facilities that is living below the poverty level is equal to the national average (13 percent). However, we note that half of the facilities (34 facilities) have populations within 50km that are above the national average for poverty.

A summary of the proximity demographic assessment performed is included as Table 2. The methodology and the results of the demographic analysis are presented in a technical report, ''Analysis of Demographic Factors for Populations Living Near Site Remediation Facilities,'' available in the docket for this action (Docket ID EPA–HQ–OAR–2002–0021).

TABLE 2—PROXIMITY DEMOGRAPHIC ASSESSMENT RESULTS FOR SITE REMEDIATION FACILITIES

| Demographic group | Nationwide | Population within 50 km of 74 facilities | Population within 5 km of 74 facilities |
|---|---|---|---|
| Total Population | 328,016,242 | 90,083,099 | 2,763,629 |
| | Race and Ethnicity by Percent (Number of facilities above national average percentage for demographic) | | |
| White | 60 | 51% (44) | 48% (48) |
| African American | 12 | 15% (33) | 15% (24) |
| Native American | 0.7 | 0.3% (13) | 0.3% (14) |
| Hispanic or Latino (includes white and nonwhite) | 19 | 21% (18) | 21% (19) |
| Other and Multiracial | 8 | 12% (17) | 16% (24) |
| | Income by Percent (Number of facilities above national average percentage for demographic) | | |
| Below Poverty Level | 13 | 13% (36) | 16% (34) |
| Above Poverty Level | 87% | 87% (38) | 84% (40) |
| | Education by Percent | | |

TABLE 2—PROXIMITY DEMOGRAPHIC ASSESSMENT RESULTS FOR SITE REMEDIATION FACILITIES—Continued

| Demographic group | Nationwide | Population within 50 km of 74 facilities | Population within 5 km of 74 facilities |
|---|---|---|---|
| | (Number of facilities above national average percentage for demographic) | | |
| Over 25 and without a High School Diploma | 12 | 13% (32) | 14% (31) |
| Over 25 and with a High School Diploma | 88 | 87% (42) | 86% (43) |
| | Linguistically Isolated by Percent (Number of facilities above national average percentage for demographic) | | |
| Linguistically Isolated | 5 | 7% (19) | 7% (13) |

**Notes:**
- The nationwide population count and all demographic percentages are based on the Census' 2015–2019 American Community Survey five-year block group averages and include Puerto Rico. Demographic percentages based on different averages may differ. The total population counts within 5 km and 50 km of all facilities are based on the 2010 Decennial Census block populations.
- To avoid double counting, the ''Hispanic or Latino'' category is treated as a distinct demographic category for these analyses. A person is identified as one of five racial/ethnic categories above: White, African American, Native American, Other and Multiracial, or Hispanic/Latino. A person who identifies as Hispanic or Latino is counted as Hispanic/Latino for this analysis, regardless of what race this person may have also identified as in the Census.

The EPA investigated the risk for exempt sources in parallel to the risk assessment for the affected sources of the category (Docket ID No. EPA–HQ–OAR–2018–0833). The maximum individual risk for cancer was 4-in-1 million for actual emissions and for maximum allowable emissions. The hazard indices for noncancer risks were well below 1 (0.3 for actual and maximum allowable emissions). The regulatory changes to this NESHAP (subpart GGGGG) discussed in section III.A of this action will further the effort to improve human health impacts for populations in these demographic groups.

Among the 13 facilities for which we anticipate this action will result in a reduction of HAP emissions, the area within 5km of at least seven of the facilities exceeds the national average for at least one racial/ethnicity demographic, the area within 5km of at least six facilities exceeds the national average for ''People Living Below the Poverty Level'', and the area within 5km of at least five facilities exceeds the national average for ''Greater than or equal to 25 years of age without a High School Diploma.'' The changes will provide additional health protection for all populations, including for people of color, low-income, and indigenous communities living near these sources.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review because it raises novel legal and policy issues. Any changes made in response to OMB recommendations have been documented in the docket.

### B. Paperwork Reduction Act (PRA)

The information collection activities in this rule have been submitted for approval to OMB under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2062.10. OMB Control Number 2060–0534. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them. To check whether the ICR for this action is approved, please consult *Reginfo.gov* at *https://www.reginfo.gov/public/do/PRASearch,* and search using OMB Control Number 2060–0534. OMB typically reviews ICR packages within sixty days of a final notice.

The information requirements are based on notification, recordkeeping, and reporting requirements in the NESHAP General Provisions (40 CFR part 63, subpart A), which are mandatory for all operators subject to national emission standards. These recordkeeping and reporting requirements are specifically authorized by section 114 of the CAA (42 U.S.C. 7414). All information submitted to the EPA pursuant to the recordkeeping and reporting requirements for which a claim of confidentiality is made is safeguarded according to agency policies set forth in 40 CFR part 2, subpart B.

*Respondents/affected entities:* Unlike a specific industry sector or type of business, the respondents potentially affected by this ICR cannot be easily or definitively identified. Potentially, the Site Remediation NESHAP may be applicable to any type of business or facility at which a site remediation is conducted to clean up media contaminated with organic HAP when the remediation activities are performed, the authority under which the remediation activities are performed, and the magnitude of the HAP in the remediation material meets the applicability criteria specified in the rule. A site remediation that is subject to this rule potentially may be conducted at any type of privately-owned or government-owned facility at which contamination has occurred due to past events or current activities at the facility. For site remediation performed at sites where the facility has been abandoned and there is no owner, a government agency takes responsibility for the cleanup.

*Respondent's obligation to respond:* Mandatory (42 U.S.C. 7414).

*Estimated number of respondents:* 104 total for the source category, of which 74 are estimated to become respondents as a result of this final action.

*Frequency of response:* Semiannual.

*Total estimated burden:* 42,945 total hours (per year) for the source category, of which 24,068 hours are estimated as a result of this final action. Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $3.1 million total (per year) for the source category, of which approximately $2.7 million is estimated as a result of this final action. This includes $250,000 total annualized capital or operation and maintenance costs for the source category, of which $146,000 is estimated as a result of this final action.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. The final amendments to the Site Remediation NESHAP are estimated to affect 74 facilities. Of these 74 facilities, 19 are owned by the Federal Government, which is not a small entity. The remaining 55 facilities are owned by 46 firms, and the Agency has determined that one of these can be classified as a small entity using the Small Business Administration size standards for their respective industries. The small entity subject to the requirements of this action is a small business. The Agency has determined that one small business may experience an impact of less than 0.1% of revenues in one year. Details of this analysis are presented in the memorandum, ''Economic Impact Analysis for Site Remediation NESHAP Amendments: Final Report,'' which is available in the docket for this action (Docket ID No. EPA–HQ–OAR–2002–0021).

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. While this action creates an enforceable duty on the private sector, the cost does not exceed $100 million or more.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. It will not have substantial direct effects on tribal governments, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes, as specified in Executive Order 13175. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 because it is not economically significant as defined in Executive Order 12866, and because the EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children. Because the proposed rule amendments would result in reduced emissions of HAP and reduced risk to anyone exposed, the EPA believes that the proposed rule amendments would provide additional protection to children. More information on the source category's risk can be found in section IV of the preamble published on September 13, 2019 (84 FR 46138). The complete risk analysis results and the details concerning its development are presented in the memorandum entitled ''Residual Risk Assessment for the Site Remediation Source Category in Support of the 2019 Risk and Technology Review Proposed Rule,'' available in the docket (Docket ID No. EPA–HQ–OAR–2018– 0833).

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. Additional technological controls are not anticipated due to this action and no increased energy use is expected.

*I. National Technology Transfer and Advancement Act*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations (people of color and/or Indigenous peoples) and low-income populations as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The results of our demographic analysis show that the percentages of people of color, low-income populations and/or indigenous peoples who live within 5 km of the 74 existing facilities are slightly (2 or 3 percent) or moderately higher (8 percent) than the national average: African American (15 percent versus 12 percent nationally), Hispanic/Latino (21 percent versus 19 percent nationally), Other/Multiracial (16 percent versus 8 percent nationally), people living below the poverty level (16 percent versus 13 percent nationally), over 25 without a high school diploma (14 percent versus 12 percent nationally) and linguistic isolation (7 percent versus 5 percent nationally). The small level of emission reductions is unlikely to affect the risk borne by these populations in a measurable amount. The reductions of 2 tons of HAP per year plus an unquantifiable amount due to the remainder of the NESHAP provisions discussed in section IV.B are not enough to be reliably quantified with respect to risk or impact. While the quantity of HAP reductions is small, directionally the final amendments increase the level of protection provided to human health and the environment by regulating site remediations previously exempt from the Site Remediation NESHAP.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

**List of Subjects in 40 CFR Part 63**

Environmental protection, Air pollution control, Hazardous substances, Reporting, and recordkeeping requirements.

**Michael S. Regan,**
*Administrator.*

For the reasons stated in the preamble, the Environmental Protection Agency amends title 40, chapter I, of the Code of Federal Regulations (CFR) as follows:

**PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES**

■ 1. The authority citation for part 63 continues to read as follows:

Authority: 42 U.S.C. 7401 *et seq.*

## Subpart GGGGG—National Emission Standards for Hazardous Air Pollutants: Site Remediation

### § 63.7881 [Amended]

■ 2. Section 63.7881 is amended by removing and reserving paragraphs (b)(2) and (3).

■ 3. Section 63.7882 is amended by adding paragraph (d) to read as follows:

### § 63.7882 What site remediation sources at my facility does this subpart affect?

\* \* \* \* \*

(d) Notwithstanding paragraphs (b) and (c) of this section:

(1) Each affected source for your site is considered an existing source if your site remediation commenced construction or reconstruction under the authority of the Comprehensive Environmental Response and Compensation Liability Act (CERCLA) as a remedial action or a non-time-critical removal action on or before May 13, 2016.

(2) Each affected source for your site is considered an existing source if your site remediation commenced construction or reconstruction under a Resource Conservation and Recovery Act (RCRA) corrective action conducted at a treatment, storage, and disposal facility (TSDF) that is either required by your permit issued by either the U.S. Environmental Protection Agency (EPA) or a state program authorized by the EPA under RCRA section 3006; required by orders authorized under RCRA; or required by orders authorized under RCRA section 7003 on or before May 13, 2016.

(3) Each affected source for your site is considered a new source if your site remediation commenced construction or reconstruction under the authority of CERCLA as a remedial action or a non-time-critical removal action after May 13, 2016.

(4) Each affected source for your site is considered a new source if your site remediation commenced construction or reconstruction under a RCRA corrective action conducted at a TSDF that is either required by your permit issued by either the U.S. Environmental Protection Agency (EPA) or a State program authorized by the EPA under RCRA section 3006; required by orders authorized under RCRA; or required by orders authorized under RCRA section 7003 after May 13, 2016.

■ 4. Section 63.7883 is amended by adding paragraph (g) to read as follows:

### § 63.7883 When do I have to comply with this subpart?

\* \* \* \* \*

(g) Notwithstanding paragraphs (a) through (f) of this section, the following dates for compliance apply to sources identified in § 63.7882(d):

(1) Site remediations identified in § 63.7882(d)(1) and (2) must comply with the requirements of this subpart that apply to you no later than June 24, 2024.

(2) Site remediations identified in § 63.7882(d)(3) and (4) must comply with the requirements of this subpart that apply to you no later than December 22, 2022, or upon initial startup, whichever is later.

[FR Doc. 2022–27523 Filed 12–21–22; 8:45 am]
**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

[EPA–HQ–OPP–2022–0189; FRL–10458–01–OCSPP]

### Iron Oxide ($Fe_3O_4$) in Pesticide Formulations Applied to Animals; Tolerance Exemption

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Final rule.

**SUMMARY:** This regulation establishes an exemption from the requirement of a tolerance for residues of iron oxide ($Fe_3O_4$) (CAS Reg. No. 1317–61–9) when used as an inert ingredient (colorant) in pesticide formulations applied to animals. The United States Department of Agriculture (USDA) Animal and Plant Health Inspection Service submitted a petition (IN–11661) to EPA under the Federal Food, Drug, and Cosmetic Act (FFDCA), requesting establishment of an exemption from the requirement of a tolerance. This regulation eliminates the need to establish a maximum permissible level for residues of iron oxide ($Fe_3O_4$), when used in accordance with the terms of that exemption.

**DATES:** This regulation is effective December 22, 2022. Objections and requests for hearings must be received on or before February 21, 2023 and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPP–2022–0189, is available at *https://www.regulations.gov* or at the Office of Pesticide Programs Regulatory Public Docket (OPP Docket) in the Environmental Protection Agency Docket Center (EPA/DC), West William Jefferson Clinton Bldg., Rm. 3334, 1301 Constitution Ave. NW, Washington, DC 20460–0001. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room and the OPP docket is (202) 566–1744. For the latest status information on EPA/DC services, docket access, visit *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Daniel Rosenblatt, Registration Division (7505T), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001; main telephone number: (202) 506–2875; email address: *RDFRNotices@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. General Information

*A. Does this action apply to me?*

You may be potentially affected by this action if you are an agricultural producer, food manufacturer, or pesticide manufacturer. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

- Crop production (NAICS code 111).
- Animal production (NAICS code 112).
- Food manufacturing (NAICS code 311).
- Pesticide manufacturing (NAICS code 32532).

*B. How can I get electronic access to other related information?*

You may access a frequently updated electronic version of 40 CFR part 180 through the Office of the Federal Register's e-CFR site at *https://www.ecfr.gov/current/*title-40.

*C. How can I file an objection or hearing request?*

Under FFDCA section 408(g), 21 U.S.C. 346a(g), any person may file an objection to any aspect of this regulation and may also request a hearing on those objections. You must file your objection or request a hearing on this regulation in accordance with the instructions provided in 40 CFR part 178. To ensure proper receipt by EPA, you must identify docket ID number EPA–HQ–OPP–2022–0189 in the subject line on the first page of your submission. All objections and requests for a hearing must be in writing and must be received

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL<br><br>*Petitioner*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>*Respondent*. | Case No. _____ |

**RULE 26.1 DISCLOSURE STATEMENT FOR THE
AMERICAN CHEMISTRY COUNCIL**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Petitioner the American Chemistry Council ("ACC") makes the following declarations:

The American Chemistry Council (ACC) represents the leading companies engaged in the business of chemistry. ACC members apply the science of chemistry to make innovative products and services that make people's lives better, healthier and safer. ACC is committed to improved environmental, health and safety performance through Responsible Care®; common sense advocacy designed to address major public policy issues; and health and environmental research and product testing. The business of chemistry is a $768 billion enterprise and a key

element of the nation's economy.  It is among the largest exporters in the nation, accounting for fourteen percent of all U.S. goods exported.  ACC states that it is a "trade association" for purposes of Circuit Rule 26.1(b).  ACC has no parent corporation, and no publicly held company has 10 percent or greater ownership in ACC.

        Respectfully submitted,

        /s/ David Friedland
        David Friedland (D.C. Cir. Bar No. 47402)
        BEVERIDGE & DIAMOND, PC
        1900 N Street, NW, Suite 100
        Washington, DC 20036
        202-285-4326
        dfriedland@bdlaw.com
        *Counsel for Petitioners*
        *American Chemistry Council*

*Of Counsel:*

Elliott Zenick
American Chemistry Council
700 Second Street NE
Washington, DC 20002

Dated:  February 21, 2023

2

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN CHEMISTRY COUNCIL

*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY

*Respondent*.

Case No. _____

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. l5(c), Circuit Rule l5(a), and 40 C.F.R. § 23.12(a), the undersigned hereby certifies that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, and served by certified mail, return receipt requested, on the following:

Michael Regan Administrator
Office of the Administrator (1101A)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW Washington, DC 20460

Merrick Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dated: February 21, 2023                    /s/ Denise Paul